## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**JOHNSON CONTRACTORS, INC.,**
     Plaintiff,

**v.**

**Case No. 5:23-cv-28-CLM**

**STARBELT, LLC, et al.,**
     Defendants.

### MEMORANDUM OPINION

Plaintiff Johnson Contractors, Inc. ("JCI") sues Defendants Starbelt, LLC; Meta Platforms, Inc.; Holder Construction Group, LLC; Schuff Steel Co., Inc.; Euler Hermes North American Insurance Company; Everest Reinsurance Company; and Markel Insurance Company, alleging that JCI has not been adequately compensated for steel erection work JCI performed for the construction of a Facebook data center in Huntsville. Several Defendants move for summary judgment. (*See* Docs. 123, 131, 133).

As explained within, the court **GRANTS** Starbelt and Meta's motion for summary judgment (doc. 131) and will **DISMISS** JCI's claims against them **WITH PREJUDICE**. The court **DENIES** Holder's motion for partial summary judgment (doc. 133). The court **GRANTS IN PART** and **DENIES IN PART** Schuff's motion for partial summary judgment (doc. 123). The parties will try these claims during the **February 2, 2026**, bench trial:

- **JCI Counts 1-2:** Breach of Contract against Schuff and Holder;
- **JCI Counts 3-4:** Violation of the Alabama Prompt Pay Act against Schuff and Holder;
- **JCI Count 6:** Quantum Meruit against Holder;
- **JCI Count 8:** Lien Perfection against Euler Hermes, Everest Reinsurance, and Markel;
- **JCI Count 9:** Fraud against Holder;
- **Schuff Counterclaim 1:** Breach of Contract; and
- **Schuff Counterclaim 2:** Indemnity.

## BACKGROUND

JCI worked as a sub-subcontractor providing steel erection services for construction of a Facebook data center in Huntsville. According to JCI, it wasn't adequately paid for its services. So JCI sues Starbelt (the owner of the property), Meta (the owner of Facebook), Holder (the general contractor), and Schuff (the subcontractor that JCI originally contracted with).

### A.    Relationship among the parties

Meta owns and operates several social media platforms, including Facebook and Instagram. According to Meta's Rule 30(b)(6) representative, Meta created Starbelt to construct a Facebook data center in Huntsville. (*See* Doc. 143-50, p. 5). Starbelt acquired the property needed to build the data center, then hired Holder as the general contractor responsible for construction of two data center buildings, an administrative building, and associated work site. (*See* Doc. 135-1, ¶ 2). Holder then subcontracted with Schuff to provide all materials, labor, and equipment necessary for the installation of all structural and miscellaneous steel for the Project. (*See id.*). Schuff sub-subcontracted with JCI to erect all structural and miscellaneous steel for the Project. (*Id.*, ¶ 3).



### B.    Schuff's contracts with Holder and JCI

Two contracts involving Schuff are important here: (1) Holder's general contract with Schuff (the "Holder general contract"), and (2) the subcontract between Schuff and JCI (the "JCI subcontract"). The JCI subcontract provided that JCI would be compensated for its work on a "lump sum or fixed price basis." (*See* Doc. 126-1, pp. 2, 5). The JCI subcontract incorporated as an "integral part of" the subcontract the terms of the general contract between Holder and Schuff. (*See* Doc. 126-1, p. 4).

The Holder general contract provided that Holder reserved "the right to contact any and all of Subcontractor's suppliers, vendors, and sub-subcontractors to inquire and to assist with the status and delivery of any material to be used on the project." (Doc. 127-1, p. 4). But the JCI subcontract prohibited JCI from dealing "directly with either the Contractor, Owner or the Architect without prior written authorization in each instance from an Authorized Representative of Schuff." (Doc. 126-1, p. 10). For example, the JCI subcontract said that JCI could not "negotiate directly with [Holder] for any addition(s), deletion(s), or alternation(s) on the Project." (*See id.*).

The JCI subcontract also included a "no damages for delays" clause. The court quotes it below, substituting JCI for "Subcontractor" for reading ease:

> DELAYS. JCI shall be responsible for any and all loss and damage as a result of any delay caused, in whole or in part by the Work of JCI. If JCI is delayed without any fault or responsibility of JCI, JCI shall submit notice to Schuff within 24 hours after such cause of delay arising describing the cause for the delay. JCI understands that there may be liquidated, actual and/or consequential damages that may apply as a result of the delay in accordance with the Contract Documents. Should Schuff be assessed any damages due to any delay or deficiency in JCI's work, JCI shall be responsible for its share of those damages.
>
> a. Schuff shall not be liable to JCI for any damages or additional compensation for any delay by any act or omission of the Owner, Contractor, or other Subcontractor.

> b. JCI's sole and exclusive remedy for any delay shall be an extension of time for performance of the Work.

(*Id.*, p. 7).

The JCI subcontract required JCI to "give Schuff written notice of all claims or disputes within twenty-four (24) hours of the beginning of the event for which the claim may be made. . . . Failure to notify Schuff within twenty-four (24) hours will constitute an absolute waiver of said claims." (*Id.*).

### C.    Procurement, fabrication, and delivery issues

JCI's subcontract anticipated it would take 29 weeks for JCI to complete its work, and it included a scheduled end date of February 28, 2022. (*Id.*, p. 19). But Schuff expected that the subcontract would remain open for nonstructure erection work beyond this 29-week period. (Doc. 143-1, pp. 79–80).

Schuff was responsible for procuring, fabricating, and delivering steel to the Project site. (*See* Doc. 143-1, pp. 9–10). In July 2021, Schuff prepared a revised steel delivery schedule that required pushing back the date of scheduled steel deliveries. (*See* Doc. 143-40). About a month later, Holder emailed Schuff that its steel deliveries were not being delivered on time and Schuff responded by noting "this situation with our deliveries to site should not be happening and we are working diligently to have this resolved for good." (*See* Doc. 143-41). Ten days later, Holder emailed Schuff that it was "out of control and unacceptable that we are still having [steel] material delivery issues." (Doc. 143-42, p. 3). Schuff "acknowledge[d] that communication from our side has not been where it needs to be" and "that deliveries out of Mexico" were disorganized. (*See id.*, p. 2). Schuff also explained that because it "had so much steel fabricated and planned for delivery . . . when we needed to make changes and move loads around, it became a bigger mess than we expected." (*See id.*). A September 26, 2021, status report noted that only 1 of the Project's 14 milestones were on target or had been achieved. (Doc. 142-44, p. 2).

During the fall of 2021, Holder sent several emails and notifications to Schuff that its delays in delivering steel materials were hurting the Project. (*See* Doc. 143-19, pp. 19–20). In December 2021, Holder sent Schuff a letter demanding that Schuff comply with the contract documents and stating that

the Project had been impacted by "late shipments, material delays, out of sequence steel delivered to the site creating inefficiencies, mixed loads of steel out of sequence, steel that is critical path delaying erecting due to a lack of primer or other miscellaneous issues . . . ." (Doc. 143-46, p. 5).

Schuff's problems securing steel hampered JCI's ability to erect steel. JCI documented many of these issues in its Daily Reports, which were uploaded to ProCore, a project management software program accessible to all parties. For example, JCI noted these issues in October and November 2021:

<u>October 2021:</u>
- 10/13/2021: 6 hours downtime no iron to shake out
- 10/14/2021: Operator Down 10 Hrs, No Iron Seq 5
- 10/19/2021: No Iron Seq 5
- 10/25/2021: Down All day No Seq 5 Iron
- 10/26/2021: Unloaded Truck or iron, (not needed yet) 26,13

<u>November 2021:</u>
- 11/01/2021: 3 hrs down no iron
- 11/02/2021: trucks are mixed with different seq's (Pissing me off!!)
- 11/03/2021: Hang all the iron we have for seq 12. waiting on parapet steel

(Doc. 124-2, p. 23). During this time, "Schuff and JCI were in regular, if not daily, communication about steel deliveries" through emails, verbal conversations, daily meetings, and daily reports. (*See* Doc. 143-66, pp. 56–57).

### D.    The Holder-JCI work order

From December 11, 2021, to March 3, 2022, JCI began performing work directly for Holder to accelerate the completion of steel erection. (Doc. 129-1, pp. 62–65). By January 2022, Holder was worried that JCI would walk off the job. (Doc. 143-1, pp. 21–22). So on January 14, 2022, Holder sent JCI a proposed work order authorization which would allow Holder to pay JCI on a time and materials basis:

| From: | Sammy DeMarais |
|---|---|
| Sent: | Friday, January 14, 2022 4:19 PM CST |
| To: | Patrick Curtin; Sammy DeMarais |
| CC: | Justin Boozer; Russ Lambert; Craig Jackson; Sidney LeBeauf; Erica Stanfield; Valerie Venable |
| Subject: | RE: Completed Approved Work |
| Attachments: | NHA56 - JCI Work Order Draft 01.14.22.pdf |

Patrick and the JCI Team –

Please see the attached DRAFT copy of the work order for JCI. This contract will allow us to pay JCI on a T&M basis.

On Tuesday, we can talk more about getting JCI enrolled in OCIP under Holder Construction.   Patrick, on Tuesday can we hop on a call and go over some corrections needed on the premium time CORs?

Thank you,

**Sammy DeMarais**
HOLDER CONSTRUCTION
phone: 630-631-7355

(Doc. 135-30, p. 2).[1]

Holder says its intent for the work order authorization was to reach an agreement with JCI for the performance of certain premium time work and establish rates applicable for this work. (*See* Doc. 135-1, ¶ 6). But JCI says that Holder wanted to enter into the work order authorization to keep JCI on the Project and use JCI's workforce to bring the Project schedule current. (*See* Doc. 143-19, pp. 61, 79). At 1:43 PM on March 1, 2022, Paul Scherman, Holder's Senior Project Manager, signed the work order authorization contract. (*See* Doc. 135-35, p. 14).

JCI did not seek or receive written authorization from Schuff to execute a work order authorization contract with Holder. (*See* Doc. 125-1, p. 6; doc. 130-3, p. 4; doc. 130-1, p. 37). But on March 2, 2022, JCI provided Holder with a proposal that explained how long JCI believed its accelerated work would take and the estimated cost of this work. (*See* Doc. 135-32, pp. 11–13). That same day, Holder verbally advised Schuff that it intended to enter into a work order contract with JCI. (*See* Doc. 135-36, p. 2). On March 3, 2022, at 5:02 AM Sammy DeMarais, Holder's Project Manager, signed the work order authorization. (*See* Doc. 135-35, p. 14). Around 45 minutes later, Patrick

---

[1] Schuff contends that JCI was the one who approached Holder about entering into the work order authorization. (*See* Doc. 143-73, p. 13). But viewing the evidence in the light most favorable to JCI (the non-moving party), Holder first approached JCI.

Curtain, JCI's assistant project manager, signed the work order authorization. (*See id.*). At 9:03 AM, Jim Linyard, Schuff's VP of Special Projects, emailed Scherman a letter accusing Holder of wrongfully interfering with Schuff's subcontract with JCI. (Doc. 147-1, pp. 2–4). Copied on the email were DeMarais and Chad Morehouse, a Holder director. (*See id.*, p. 2). Morehouse signed the work order authorization at 10:53 AM on March 4. (Doc. 135-35, p. 15).

Around March 16, Holder issued a subcontract change order (SCO 004) to Schuff for $626,468, which incorporated the Holder-JCI Work Order into the Holder general contract with Schuff. (Doc. 135-1, ¶ 12). DeMarais says that she verbally told JCI about this subcontract change order within days of issuing it. (Doc. 143-73, pp. 17–18). But as JCI points out, nothing in writing shows that JCI was immediately told about the change order, and JCI was never sent a copy of SCO 004. (*See id.*, p. 18; Doc. 143-19, p. 59). On May 3, 2022, JCI emailed Holder to follow up about payment for work performed under the work order authorization. (*See* Doc. 135-41, pp. 3–4). Holder responded that it hadn't been "funded for March yet, but I do have your cost included in the bill I submitted." (*See id.*, p. 2). Holder says it was prevented from paying JCI for premium time performed in March and April 2022 because Schuff hadn't incorporated the Holder-JCI work order into its subcontract and Holder hadn't received an invoice for the work. (*See* Doc. 135-1, ¶ 17). So "Holder increased the accrual in the May payment application based on the documents in discussion with JCI at that time." (*See id.*).

As of May 23, 2022, Schuff had still not executed the change order issued for the Holder-JCI work order. (*See id.*, ¶ 25). JCI again asked Holder when it could expect its "first payment from Holder," and Holder responded by asking JCI to create invoices for the time and materials work. (*See* Doc. 135-47). On June 13, JCI emailed Holder and asked "[d]o you know if our check is getting cut this week?" (Doc. 135-42, p. 2). Holder responded that it was "unable to cut you a check this week because Schuff refuses to sign the SCO we sent them." (*Id.*). JCI ultimately submitted 14 tickets to Holder for work performed on a time and materials basis from March 7, 2022, through June 12, 2022. (*See* Doc. 135-1, ¶ 29). Holder reviewed the tickets and found that JCI was owed $2,034,935 for work performed under the Holder-JCI Work Order, including premium time and remediation work. (*Id.*, ¶ 30). Holder later determined that this amount should be reduced to $1,934,278. (*See id.*).

7

On August 26, Holder provided Schuff with a revised SCO 004, which compensated JCI for $1,934,278 of its ticketed work. (*See* Doc. 135-49, p. 161). On August 29, JCI informed Holder that JCI would demobilize and leave the site if it did not receive payment for its ticketed work. (*See* Doc. 135-51, p. 3). That same day, Schuff executed the change order, informed JCI that Schuff had received a change order that included pass through payments for JCI's ticketed work, and told JCI that Schuff would provide JCI with a change order later that week. (Doc. 135-50, p. 2). On September 9, Schuff issued a change order to JCI for $1,934,278. (Doc. 135-52, p. 2). On October 4, JCI rejected the change order, asserting that Holder owed JCI $3,870,452.30. (*See* Doc. 135-53, p. 2). A week later, Schuff returned the $1,934,278 back to Holder. (Doc. 135-54, p. 2). Holder then attempted to directly pay JCI the $1,934,278, but JCI also rejected the direct payment from Holder. (Doc. 135-1, ¶¶ 37–38).

### E.    Affidavits of waiver + change orders

While working on the Project, JCI executed multiple "Sub Tier Subcontractor/Supplier or Vendor Affidavit of Waiver of Lien and Claims" forms. (*See* Docs. 128-6, 128-7, 128-8). On May 3, 2022, JCI executed a waiver that said that JCI "has been paid in full for services provided and/or materials supplied through the date of 2/28/2022. [JCI] agrees to waive and release any rights to claim or lien against the project through this date." (Doc. 128-8, p. 2).

JCI and Schuff also executed 9 change orders throughout the Project. (*See* Docs. 128-9 to 128-17). Change orders 1 and 2 explained that "[b]y acceptance of the Change Order, [JCI] waives all future rights to any additional compensation for the Work indicated. The amount of this Change Order includes all cost and schedule related impacts, claims, acceleration, inefficiencies and/or lost productivity related to this change in scope." (Doc. 128-9, p. 2; doc. 128-10, p. 1). Under change orders 3–7, JCI "retain[ed] all rights to pursue any difference in the amount" paid and JCI's request amount. (Docs. 128-11, pp. 1–2; 128-12, p.2; 128-13, p. 1; 128-14, p.2; 128-15, p. 2). But each of these change orders stated that "[t]he amount of this Change Order includes all cost and schedule related impacts, claims, acceleration, inefficiencies and/or lost productivity related to this change in scope." (Docs. 128-11, p. 2; 128-12, p. 2; 128-13, p.1; 128-14, p.2; 128-15, p. 2). Change orders 10 and 11 explained that:

> JCI and Schuff acknowledge these approved change order requests have been approved for less than the submitted values based on values accepted by Holder. By signing this Change Order, the amount accepted is a provisional acceptance to allow undisputed funds to be paid in subsequent payment applications. JCI reserves its rights to pursue the balance of any change order request not yet accepted.
>
> By acceptance of the Change Order, Subcontractor/Supplier ~~waives all future rights to any additional compensation for the Work indicated.~~ retains all rights to pursue any difference in the amount shown and the request amount. The amount of this Change Order includes all cost and schedule related impacts, claims, acceleration, inefficiencies and/or lost productivity related to this change in scope. Adjustments to the amounts shown herein will be adjusted by future change order as [JCI] and Schuff reach final settlement for each change order submitted that was not fully compensated.

(Docs. 128-16, p. 1; 128-17, p. 1). Ultimately, JCI submitted 69 proposed change orders to Schuff that remain pending and disputed. (*See* Doc. 143-47).

### F.   JCI's alleged damages

JCI's amended complaint asserts 9 counts. (Doc. 106). Counts 1 and 2 are breach of contract claims against Holder and Schuff. Counts 3 and 4 allege that Holder and Schuff violated Alabama's Prompt Pay Act. Counts 5, 6, and 7 are quantum meruit claims against Holder, Schuff, Starbelt, and Meta. Count 8 is a lien perfection claim against Euler Hermes, Everest Reinsurance, and Markel ("the Sureties"). And Count 9 is a fraud claim against Holder.

According to JCI's damages expert, Pearson Management Group, Inc., JCI is owed $7,346,917 plus interest, penalties, and attorney's fees. (*See* Doc. 129-1, p. 48). Here is how Pearson calculates JCI's damages:

| Category | Description | Value |
|---|---|---|
| A–D | Remaining Subcontract Balance | $960,944 |
| E | Pending/Disputed CORs | $3,036,564 |
| F | Pre-Work Order Authorization T&M Tickets | $89,053 |
| G | Work Order Authorization T&M Tickets | $3,260,356 |
| **E–G** | **Additional Compensation Subtotal** | **$6,385,972** |
| **A–G** | **Total Amount** | **$7,346,917** |

(Docs. 136, p. 11; 128-5, p.1).

Categories A–D are based on Pearson's conclusion that Schuff still owes JCI $960,944 under the subcontract. (Doc. 129-1, p. 49). Category E is the calculation of damages related to the 69 pending and disputed change orders. (*See id.*). Category F relates to work JCI did for Holder before entering into the work order authorization contract. (*Id.*, p. 62). And Category G relates to work JCI performed for Holder under the work order authorization. (*Id.*, p. 63).

Pearson further divided JCI's alleged damages related to change order requests under Category E into 8 subcategories of damages. (*See id.*, pp. 49–61). Category E.1 claims $184,856 in damages for compensable downtime and asserts that Schuff's late and out-of-sequence steel deliveries caused JCI's crew and equipment to sit idle. (*Id.*, p. 49). Category E.2 claims $145,130 in field modification costs that Pearson says JCI incurred when it had to modify Schuff's misfabricated steel. (*See id.*). Category E.3 claims $159,667 in damages for extra work JCI says Schuff and Holder caused JCI's subcontractor Harris Steel to perform. (*Id.*, pp. 50–51). Category E.4 claims $34,997 in damages for out-of-sequence work caused by issues with Schuff's steel deliveries. (*Id.*, p. 51). Category E.5 claims $202,817 in damages related to costs JCI incurred when relocating materials on site. (*Id.*, p. 52). Category E.6 claims $46,585 in damages allegedly incurred by JCI when constructing a tornado shelter for the Project. (*Id.*, pp. 52–53). Category E.7 claims $2,166,144 for productivity impacts allegedly caused by Holder and Schuff. (*Id.*, pp. 53–60). And Category E.8 asserts JCI is owed $100,186 in damages that don't fit within the other categories of damages related to the disputed change order requests. (*See id.*, pp. 60–61).

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Starbelt and Meta move for summary judgment on the quantum meruit claim brought against them. (Doc. 131). Holder moves for summary judgment on the fraud claim. (Doc. 133). And Schuff moves for summary judgment on these five issues: (1) whether JCI is liable for Schuff's breach of contract counterclaim; (2) whether the subcontract bars JCI's quantum meruit claim against Schuff; (3) whether JCI has released all claims for damages that predate February 28, 2022; (4) whether the subcontract's "no damages for delay" clause bars several categories of damages that JCI seeks; and (5) whether JCI waived its lost productivity damages claims by not timely notifying Schuff of these alleged damages. (*See* Doc. 123).

Both Alabama and Georgia law might apply to these motions. Alabama law could apply because construction of the Facebook data center occurred in Alabama. And Georgia law could apply because Schuff's contract with Holder, which the subcontract between Schuff and JCI incorporated, included a choice-of-law provision that said Georgia law governed the contract. (*See* Docs. 135-2, p. 10; 135-22, p. 5). But the parties agree that there is little difference between Alabama and Georgia law on fraud and breach of contract. So in ruling on Defendants' motions, the court will cite Alabama law with the understanding that Georgia law points to the same outcome.

## I.    Starbelt + Meta

The court starts by addressing Starbelt and Meta's motion for summary judgment on the quantum meruit claim brought against them (Count 7). Quantum meruit is an equitable remedy created to avoid unjust enrichment and requires "the existence of a contract, either express or implied." *See Frank Crain Auctioneers, Inc. v. Delchamps*, 797 So. 2d 470, 474 (Ala. 2000). To establish unjust enrichment, a plaintiff must show "(1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Invs.*, LLC, 77 So. 3d 139, 145 (Ala. 2011).

Starbelt and Meta argue that the court should grant them summary judgment because (a) JCI's express contracts with Schuff and Holder bar JCI's quantum meruit claim, and (b) JCI cannot show that it had a reasonable expectation that it would receive compensation from Starbelt or Meta.

### A.    Existence of an Express Contract

JCI's quantum meruit claim against Starbelt and Meta is based on JCI's contention that Starbelt and Meta have been unjustly enriched by the steel erection services JCI performed at the direction of Schuff and Holder. Schuff's subcontract with JCI is an enforceable written contract that governed the steel erection services JCI provided Schuff. And the work JCI performed directly for Holder from March 7, 2022, to August 26, 2022, was governed by the Holder-JCI work order authorization, which "supersede[d] all other written or verbal negotiations of agreements between the parties." (*See* doc. 135-35, p. 4).

"[T]he existence of an express contract generally excludes an implied agreement relative to the same subject matter." *Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962, 965 (Ala. 1989). So "[w]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." *Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 921 (Ala. 2002). That's "because unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law." *Univalor Tr., SA v. Columbia Petroleum, LLC*, 315 F.R.D. 374, 382 (S.D. Ala. 2016).

JCI, however, contends that its express agreements with Schuff and Holder do not preclude JCI from bringing a quantum meruit claim against Starbelt and Meta because Starbelt and Meta weren't parties to those contracts. The court disagrees. JCI rightly points out that Alabama courts have sometimes articulated the rule that the existence of an express contract extinguishes a claim for unjust enrichment by saying "where an express contract exists ***between two parties***, the law generally will not recognize an implied contract regarding the same subject matter." *See Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 3d 443, 447 (Ala. 1996) (emphasis added). But this court has rejected the argument that "Alabama appellate courts have limited the preclusion of equitable claims to instances when the claimant has an express contract with the unjust enrichment defendant." *H&N Constr., Inc. v. Tarkett USA, Inc.*, 2022 WL 16557604, at *7–9 (N.D. Ala. Oct. 31, 2022) (cleaned up). And the Alabama Supreme Court's earliest cases on this topic make clear that all that matters for preclusion purposes is whether an express contract on the ***subject matter at issue*** exists. *See Alexander v. Ala. W. R. Co.*, 60 So. 295, 484–90 (Ala. 1912) (holding subcontractor could not sue railroad company for work subcontractor performed under express agreement with construction company); *Robinson Lumber Co. v. Sager*, 75 So. 309, 309–10 (Ala. 1917) (plaintiff could not bring claim for work and labor done against defendant because he had a contract for services with third-party). Thus, JCI cannot sue Starbelt and Meta for quantum meruit for steel erection services governed by the Schuff-JCI subcontract or the Holder-JCI work order authorization.

That said, JCI has adequate remedies at law for damages if it was not adequately compensated for work performed under the Schuff-JCI subcontract or the Holder-JCI work order authorization. For example, as it has done, JCI can seek breach of contract damages from Schuff and Holder. And the court rejects JCI's argument that Meta and Starbelt deprived JCI of an adequate remedy by failing to withhold Project funds from Holder. As JCI points out, Alabama law says that after receiving a notice of intent to lien, "any unpaid balance in the hands of the owner or proprietor shall be held subject to such lien." *See* Ala. Code § 35-11-218. But JCI's lien is protected by the $6,808,599.14 bond issued by the Sureties Defendants (Euler Hermes, Everest, and Markel). And while Starbelt cannot extinguish the lien by paying Holder,

*see Valley Joist, Inc. v. CVS Corp.*, 954 So. 2d 1115, 1118–19 (Ala. Civ. App. 2006), JCI hasn't shown that Starbelt's payments to Holder deprived JCI of any legal remedies.

Because the Schuff subcontract and Holder work order authorization governed JCI's steel erection services for Schuff and the acceleration work JCI performed directly for Holder from March 7, 2022, to August 26, 2022, the court will **GRANT** Starbelt and Meta's motion for summary judgment on the unjust enrichment claims against them based on these steel erection services.

## B.    Reasonable Expectation of Compensation

There is one period of JCI's work, however, that does not seem to be covered by an express contract: the pre-work order authorization work that JCI performed for Holder from December 11, 2021, to March 3, 2022. (*See* Doc. 129-1, pp. 62–63). Because JCI's express contracts with Schuff and Holder do not apply to this work, the contracts cannot bar JCI from bringing an unjust enrichment claim against Starbelt and Meta for the $89,053 JCI claims it is owed under its pre-work order authorization time and materials tickets.

But as Starbelt and Meta note, "to succeed on a claim of unjust enrichment, the plaintiff must show that it had a reasonable expectation that there would be compensation for the services." *See Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1350 (Ala. 1991). In other words, to defeat summary judgment, JCI must produce evidence that would prove JCI reasonably expected ***Starbelt or Meta***, not Holder, to pay for JCI's pre-work order authorization acceleration work. JCI points to evidence that Starbelt and Meta (a) knew JCI was performing steel erection work for the Project, (b) thought it reasonable for JCI to expect to be paid for the work it performed, (c) observed JCI performing steel erection services, and (d) took possession of the Project after receiving JCI's notice of intent to lien. (*See* Doc. 144, pp. 8–9). But none of this evidence shows that it was reasonable for JCI to believe that either Starbelt or Meta would compensate JCI for the acceleration work. And contrary to JCI's assertion, Starbelt and Meta's Rule 30(b)(6) representative did not testify that Starbelt and Meta recommended that Holder have JCI perform acceleration work. Instead, he testified that he knew that JCI's acceleration work was a mitigation strategy to recover the Project's schedule

and that Holder was "accountable for providing us with the strategies and to mitigate or provide mitigation options." (*See* Doc. 143-50, pp. 21–22). But "the law . . . raise[s] no implied promise on the part of [Starbelt and Meta] to pay [JCI] for work" it did for Holder. *See Alexander*, 60 So. at 487. And any benefit JCI's accelerated steel erection work conferred on Starbelt and Meta was merely incidental to JCI's agreement to perform this work for Holder. *See H&N Constr., Inc.*, 2022 WL 16557604, at *6. So Holder's failure to pay the disputed amounts of pre-work order authorization work doesn't allow JCI to sue Starbelt and Meta for unjust enrichment. *See Leatherwood v. Creighton*, 571 So. 2d 1136, 1138 (Ala. Civ. App. 1990) (finding that homeowner who had paid contractor for construction of his house wasn't liable to supplier for flooring costs that the contractor failed to pay).

Even in a light most favorable to JCI, the evidence shows that JCI expected that Holder would pay JCI for this work. That's why JCI submitted its pre-work order authorization tickets to Holder and JCI's damages expert asserts that "***Holder*** owes JCI $89,053 for ***Holder's*** pre-[work order authorization] directives." (*See* Doc. 129-1, p. 62 (emphasis added)). The court will thus **GRANT** Starbelt and Meta's motion for summary judgment on the quantum meruit claims related to the pre-work order authorization acceleration work.

—

Because the court's two rulings combine to dismiss all of JCI's quantum meruit claims against Starbelt and Meta, and those are the only claims against them, the court will **DISMISS** Starbelt and Meta as parties.

## II.  Holder

Holder moves for summary judgment on the fraudulent inducement claim JCI brings against it (Count 9). According to JCI, Holder fraudulently induced JCI to sign the work order authorization by representing to JCI that Holder would pay JCI directly for work performed under the work order authorization agreement. "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of

15

action." *Farmers Ins. Exchange v. Morris*, 228 So. 3d 971, 978 (Ala. 2016). Holder says it's entitled to summary judgment because (a) there's no evidence Holder intended to deceive JCI, and (b) JCI cannot prove damages.

### A.    Intent to Deceive

"[A]n intent to deceive–present at the time the promise of future performance was made–must be shown in order to recover for fraud." *Duke v. Jones*, 514 So. 2d 981, 985 (Ala. 1987). "The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made." *Id*. If "it were, a mere breach of contract would be tantamount to fraud." *See id.*

Holder contends that at the time it agreed to the work order, it intended to pay JCI directly—thus destroying JCI's fraud claim. Holder says that it later changed its mind after Schuff reacted negatively when Schuff discovered the side agreement. Out of respect for Schuff's contracts, Holder decided to instead pass payments through Schuff, and Holder says that JCI knew that Schuff would process its payments for work under the Holder-JCI work order.

Having reviewed the record evidence and having considered the parties' arguments, the court finds that there's a genuine dispute of material fact over whether Holder intentionally misrepresented that it would pay JCI directly and whether JCI was aware that payments would pass through Schuff. In January 2022, Holder told JCI that the work order authorization would "allow [Holder] to pay JCI on a T&M basis." (Doc. 135-30, p. 2). On March 2, Holder verbally advised Schuff about its plan to enter the work order authorization with JCI. (*See* Doc. 135-26, p. 2).  The next day, Curtain signed the work order authorization on behalf of JCI. (*See* Doc. 135-35, p. 14). About three hours later, Linyard sent Holder a letter asserting that Holder paying JCI directly would tortiously interfere with Schuff's subcontract with JCI. (*See* Doc. 135-30). Morehouse supplied the final Holder signature for the work order authorization the next day. (*See* Doc. 135-35, p. 15).

Viewing the evidence in the light most favorable to JCI, the work order authorization wasn't executed until Morehouse signed it on March 4. (*See* Docs. 143-73, pp. 19, 22; 135-1, ¶ 8; 135-35, p. 15). And according to Scherman, Holder's decision to process payments for work order authorization work through Schuff was based on its March 2 conversation with Schuff and March

3 letter from Linyard. (*See* Doc. 143-19, p. 59). Put together, this evidence could allow a reasonable factfinder to find that Holder knew that it would use Schuff to process JCI's payments before Holder agreed to pay JCI directly when it executed the work order authorization. Other evidence could support this conclusion. Again, Holder told JCI in January 2022 that Holder would pay JCI for work order authorization work, and Schuff wasn't involved in any of the work order authorization negotiations. So it is reasonable to believe that in JCI's mind, Holder ***alone*** was a party to the work order. After all, the evidence suggests that the work order was a side deal resulting from both parties' frustration with Schuff. There's nothing in the record that suggests that Holder or Schuff told JCI about Schuff's March 2-3 conversations with Holder until well after JCI signed the work order authorization on March 4th.

DeMarais does say that she verbally told JCI about the work order authorization subcontract change order with Schuff within days of issuing it. (Doc. 143-73, pp. 17–18). But the subcontract change order was created after Holder and JCI executed the work order authorization, and the earliest email between Holder and JCI discussing Schuff's involvement in the work order authorization is from June 2022. (*See* Doc. 135-42, p. 2). JCI's earlier emails from May 2022 asked when JCI could "expect our first payment from Holder," (*see* doc. 135-47, p. 3), suggesting that JCI was unaware that work order authorization payments would pass through Schuff. The court thus finds that whether Holder intentionally misrepresented that it would pay JCI directly for work order authorization work is a question of fact to be resolved at trial.

### B.    Damages

"[P]roof of actual damages is an essential element of a fraud claim." *P&S Bus. Machines, Inc. v. Olympia, U.S.A., Inc.*, 707 F.2d 1321, 1324 (11th Cir. 1983). And Holder says that JCI cannot prove actual damages because (a) JCI rejected Holder's attempt to directly pay JCI for work order authorization work, and (b) JCI's claimed damages are duplicative of its alleged breach of contract damages.

The court agrees with JCI that there's evidence that Holder's representation that it would directly pay JCI under the work order authorization damaged JCI. While Holder eventually attempted to directly pay JCI around $1.9 million for ticketed work under the work order authorization,

JCI says that it never would have committed to stay on the Project and perform acceleration work if it knew that Holder planned to process payments through Schuff. And Holder admits that Schuff's involvement in the work order authorization payment process hampered Holder's ability to timely pay JCI for its ticketed work. (*See* Doc. 135-1, ¶¶ 17–18, 25, 28). So JCI may prove at trial that it suffered fraud damages in the form of time, manpower, resources, and the time value of money that it cannot get back.

Plus, "where a party fraudulently conceals or misrepresents facts relating to its intention or ability to perform under a contract, a single transaction can support an award of damages for both breach of contract and fraud." *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106, 107 (11th Cir. 1989) (cleaned up). So while a plaintiff cannot recover the same compensatory damages twice, it is not "required to elect between contract and fraud remedies." *See id.* Viewing the evidence in the light most favorable to JCI, Holder entered into the work order authorization knowing that it didn't intend to pay JCI directly. And JCI was induced to enter into the work order authorization because it reasonably believed that Schuff wouldn't be involved in the acceleration work performed under that agreement. So JCI can seek both breach of contract and fraud damages from Holder. As a result, the court will **DENY** Holder's motion for summary judgment on the fraud claim.

## III.  Schuff

Schuff moves for summary judgment on its breach of contract counterclaim, JCI's quantum meruit claim, and several categories of JCI's claimed damages.

### A.    Schuff's Breach of Contract claim against JCI

Schuff's breach of contract claim against JCI asserts that JCI breached the subcontract by not obtaining Schuff's written authorization before negotiating directly with Holder to perform acceleration work for the Project. To establish breach of contract, Schuff must prove "(1) the existence of a valid contract binding the parties in the action, (2) [its] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).

18

Schuff contends that its entitled to judgment as a matter of law on the breach of contract counterclaim because the undisputed evidence shows that JCI entered into the work order authorization with Holder without receiving Schuff's "prior written authorization" as the subcontract required. (*See* Doc. 126-1, p. 10). But as JCI points out, Schuff's brief in support of its motion for summary judgment fails to establish that Schuff performed under the contract or sustained any harm from JCI's alleged breach. And JCI contends that (a) Schuff failed to perform under the subcontract by not properly providing JCI with steel or paying JCI, and (b) Schuff cannot articulate any damages it suffered as a result of JCI's negotiations with Holder.

Because Schuff failed to prove its own performance under the Schuff subcontract or that it suffered any harm from JCI's alleged breach, the court finds that Schuff has failed to meet its burden to establish that it's entitled to judgment as a matter of law on liability for its breach of contract counterclaim. *See Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 843, 857–59 (Ala. 2013) (discussing elements of breach of contract and what a plaintiff must prove to establish liability).[2] So the court will **DENY** Schuff's motion for summary judgment on its claim that JCI breached the subcontract.

## B.    JCI's claim of Quantum Meruit

Schuff moves for summary judgment on JCI's quantum meruit claim against Schuff (Count 5) contending that the subcontract bars this claim. The court agrees. As explained, "[w]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." *Brannan & Guy, P.C.*, 828 So. 2d. at 921. And the subcontract set forth the terms under which JCI was to perform "structural and miscellaneous steel erection work" for Schuff. (*See* Doc. 126-1, p. 16). The subcontract also included provisions related to changes in JCI's work, claims or disputes between JCI and Schuff, and the parties' rights and remedies as it relates to disputed work. (*See id.*, pp. 7–8). Finally, the subcontract states that "[t]his Agreement, along

---

[2] The court recognizes that "[w]hen the parties have exchanged promises of performance . . . the injured party is not excused from performing his remaining duties if he continues the agreement with knowledge of the default by the breaching party." *See Edwards v. Allied Home Mortg. Cap. Corp.*, 962 So. 2d 194, 207 (Ala. 2007). But because Schuff didn't address the plaintiff's performance element of its breach of contract counterclaim until its reply brief, the court finds that this issue is inadequately briefed.

with individual Job Orders issued for each Project and all Change Orders, constitute the entire Agreement between the parties hereto, and all additions hereto or changes herein shall be unenforceable unless reduced to writing in an Amendment and executed by both parties." (*Id.*, p. 11). Thus, the subcontract was an express agreement related to the same subject matter that JCI seeks quantum meruit recovery on. *See Vardaman*, 544 So. 2d at 965 ("[T]he existence of an express contract generally excludes an implied agreement relative to the same subject matter.").

JCI, however, contends that the existence of the subcontract doesn't doom its quantum meruit claim against Schuff because (a) there's a dispute over whether the subcontract incorporates the 69 pending and disputed change orders, and (b) Schuff wasn't a party to JCI's work order authorization agreement with Holder. But the subcontract addresses (a) changes to the scope of JCI's work, and (b) JCI's rights when it comes to disputed work. (*See* Doc. 126-1, pp. 7–8, ¶¶ 11, 14). And "[i]t is not whether Plaintiff is successful on a breach of contract claim that precludes [it's] unjust enrichment claim, it is the undisputed existence of a contract." *See Selby v. Goodman Mfg. Co., LP*, 2014 WL 24740317, at *6 (N.D. Ala. June 17, 2014). Plus, as discussed, Schuff needn't be a party to the work order authorization between Holder and JCI for that contract to bar JCI from bringing a quantum meruit claim against Schuff for work JCI performed under that agreement. *See Alexander*, 60 So. 295 at 484–90. In sum, JCI's express agreements with Schuff and Holder preclude JCI from bringing a quantum meruit claim against Schuff for the steel erection services Schuff provided under the subcontract or work order authorization.[3] So the court **GRANTS** Schuff's motion for summary judgment on JCI's quantum meruit claim against Schuff.

---

[3] The court notes that to the extent that Schuff and Holder agreed to pass payments for pre-work order authorization work through Schuff, the subcontract would govern Schuff's obligations to JCI.

### C.    JCI's Claimed Damages

Schuff also contends that the summary judgment record establishes that JCI cannot recover several of its claimed damages.

### 1.    Effect of Affidavit of Waiver of Lien and Claims

Schuff first asserts that JCI has released all claims for damages that predate February 28, 2022. As Schuff notes, on May 2, 2022, JCI executed a waiver that said that JCI "has been paid in full for services provided and/or materials supplied through the date of 2/28/2022. [JCI] ***agrees to waive and release any rights to claim or lien against the project through this date***. However, the rights to claim or lien for services provided after this date are not waived provided such services or materials are supplied after the date affixed herein." (Doc. 128-8, p. 2 (emphasis added)). Schuff says that this waiver unambiguously bars JCI from receiving compensation for any damages incurred through February 28, 2022. *See Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So. 2d 314, 317 (Ala. 1993) (finding that release relieved general contractor and owner from "any and all claims" subcontractor "may have that in any way relate to the construction through the date of execution of the release" (cleaned up)).

But there's a catch. Unlike in the cases Schuff cites, Schuff is not mentioned as a released party in the May 2022 waiver. *See id.* at 316 (subcontractor released "any and all claims and liens [of] whatsoever kind or nature against DUNN, DUNN's surety, the Owner, and against the building, improvements or projects" (emphasis omitted)); *ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp. 2d 1286, 1299 (S.D. Ala. 2013) (contractor released defendant "from all claims of any kind arising under or by virtue of said contract"). Instead, the waiver says that JCI agreed "to waive and release any rights to claim or lien ***against the project***." (Doc. 128-8, p. 2 (emphasis added)). So JCI asserts that the release waived only JCI's right to claim a lien against the Project for work performed through February 28, 2022.

The court tends to agree with JCI's interpretation of the waiver. Schuff is not named as a party to the release. And the waiver does not broadly release "any and all claims" JCI might bring for the work it performed through February 28, 2022. *Cf. Wayne J. Griffin*, 622 So. 2d at 316 (releasing "any and

all claims and liens [of] whatsoever kind or nature against" the general contractor, the general contractor's surety, and the owner). It instead specifically waived JCI's rights to bring a claim or lien against "the project." The Eleventh Circuit has interpreted a similar release "as releasing lien claims against the property, not causes of action against [the general contractor] under the subcontract." *See Allgood Elec. Co. v. Martin K. Eby Constr. Co., Inc.*, 85 F.3d 1547, 1549, 1553 (11th Cir. 1996) (interpreting release of "all claim or rights of lien which the undersign [sic] may now have upon the premises above described").

In any event, it is at least ambiguous whether the affidavit of waiver of lien and claims released JCI's breach of contract claims against Schuff for work performed through February 28, 2022. *See L.A. Merrell Constr. Co., Inc. v. County of Sussex*, 1992 WL 183067, at *1 (Del. Super June 15, 1992) (finding it ambiguous whether release of "lien or claim or right of lien" released contract claims). And "[i]f the Court determines that the terms of [a] document are ambiguous in any respect, then the true meaning of the document becomes a question for the factfinder." *Wayne J. Griffin*, 622 So. 2d at 317. So the court will **DENY** Schuff's motion that JCI be barred, as a matter of law, from seeking damages that accrued before February 28, 2022.[4]

### 2.     Effect of No Damages for Delay Clause

Schuff next contends that the no damages for delay clause in the Schuff-JCI subcontract bars categories E.1 through E.8 of JCI's claimed damages, plus the portions of damages in claim categories F and G that seek compensation for accelerated subcontract work. Again substituting JCI for "Subcontractor," the no damages for delay clause provides that:

> DELAYS. JCI shall be responsible for any and all loss and damage as a result of any delay caused, in whole or in part by the Work of JCI. If JCI is delayed without any fault or responsibility of JCI, JCI shall submit notice to Schuff within 24 hours after such cause of delay arising describing the cause for the delay. JCI

---

[4] To the extent that Schuff is arguing that statements JCI made in the executed change orders waived some of JCI's claimed damages, the court finds that Schuff hasn't adequately developed this argument. Thus, Schuff hasn't met its burden to establish that it is entitled to judgment as a matter of law on this issue. *See* Fed. R. Civ. P. 56(a).

> understands that there may be liquidated, actual and/or consequential damages that may apply as a result of the delay in accordance with the Contract Documents. Should Schuff be assessed any damages due to any delay or deficiency in JCI's work, JCI shall be responsible for its share of those damages.
>
> a. Schuff shall not be liable to JCI for any damages or additional compensation for any delay by any act or omission of the Owner, Contractor, or other Subcontractor.
>
> b. JCI's sole and exclusive remedy for any delay shall be an extension of time for performance of the Work.

(Doc. 126-1, p. 7). Schuff asserts that subsection b's provision that JCI's "sole and exclusive remedy for any delay" is an extension of time means that JCI cannot sue Schuff for causing delays in JCI's work. *See Marriott Corp. v. Dasta Constr. Co.*, 26 F.3d 1057, 1070 & n.26 (11th Cir. 1994) (enforcing no damages for delay clause and rejecting contractor's "creative attempt to label its way around the no damage for delay clause" by calling damages impact and inefficiency damages).

JCI responds that subsections a and b of the no damages for delay clause must be read together. And because subsection a refers to delays caused by Starbelt, Holder, and Schuff's other subcontractors, JCI says that subsection b does not insulate Schuff from liability for delays caused by Schuff.

At this stage, the court needn't decide which interpretation of the no damages for delay clause is correct. While Schuff has presented evidence that the damages sought in Claim Categories E, F, and G are delay damages, JCI has presented evidence that it isn't seeking delay damages. For example, Pearson testified that JCI did "not have a time-related claim" and that its claimed impact damages were not the result of a delay. (*See* Doc. 124-1, p. 34). Thus, even under Schuff's interpretation of the no damages for delay clause, there is a genuine dispute of material fact about whether JCI is claiming damages that the clause bars. As a result, the court will **DENY** Schuff's motion for summary judgment related to the no damages for delay clause.

### 3.    Lost Productivity Damages Claim

Schuff finally argues that JCI has waived its right to claim the $2,166,144 in productivity impact damages it seeks in Clam Category E.7 because JCI failed to provide Schuff with adequate notice of its lost productivity claims under the subcontract. As Schuff notes, the subcontract says that JCI must "give Schuff notice of all claims or disputes within twenty-four (24) hours of the beginning of the event for which the claim may be made." (Doc. 126-1, p. 7, ¶ 14). "Failure to notify Schuff within twenty-four (24) hours . . . constitute[s] an absolute waiver of said claims." (*See id.*). Elsewhere, the subcontract defines "notice" as written notice either mailed or emailed to Jim Linyard at his office address or work email. (*See id.*, p. 11, ¶ 27).

JCI first submitted "an impact type change order request" on October 6, 2022. (*See* Doc. 129-1, p. 54). But JCI asserts that it began to experience lost productivity damages by August 1, 2021. (*See id.*, p. 56). So Schuff contends that JCI failed to satisfy the notice requirement and has thus "absolute[ly]" waived its lost productivity damages claim. (*See* Doc. 126-1, p. 7, ¶ 14). JCI responds that "[t]he record is overwhelmingly replete with written documentation of impacts to JCI's work in the form of daily reports, daily meeting minutes, change order requests, email correspondence, and testimony confirming verbal conversations between the parties." (*See* Doc. 146, p. 36). But JCI does not cite "to particular parts of materials in the record" that support this assertion for a lost productivity claim. *See* Fed. R. Civ. P. 56(c)(1)(A). So the court considers it undisputed that JCI first notified Schuff that it had lost productivity claims on October 6, 2022. *See* Fed. R. Civ. P. 56(e)(2).

Compliance with Rule 56 aside, even considering JCI's daily reports, the first daily report cited by Pearson when discussing Schuff's impacts on JCI's work is from August 11, 2021, which is more than a week after JCI claims it began to experience lost productivity damages. (*See* Doc. 129-1, p. 22). And JCI has presented no evidence that the daily reports, or any of its other pre-October 6, 2022, correspondence with Schuff, satisfied the subcontract's requirement that all notices of claims be sent to Jim Linyard in a specific format. (*See* Doc. 126-1, p. 11, ¶ 27 (requiring all notices other than posted notices be in writing and sent to Linyard via either registered mail, postage prepaid, or email)). "[T]he court cannot refine away the terms of [a] contract that are expressed

24

with sufficient clarity to convey the intent and meaning of the parties." *Kinnon v. Universal Underwriters Ins. Co.*, 418 So. 2d 887, 888 (Ala. 1982). So when a contract is conditioned upon a specific notification procedure, "[n]o other notice [will] suffice." *See Curacare, Inc. v. Pollack*, 501 So. 2d 470, 472 (Ala. Civ. App. 1986). The court thus finds that JCI failed to properly notify Schuff of any lost productivity damages claims that began to accrue before October 5, 2022. (*See* Doc. 126-1, p. 7, ¶ 14).

Because JCI did not timely notify Schuff of any lost productivity claims that began to accrue before October 5, 2022, the court finds that JCI has "absolute[ly]" waived these claims. (*See id.*). Thus, the court **GRANTS** Schuff's motion for summary judgment to the extent that the court finds that the subcontract bars JCI from suing Schuff for damages for lost productivity claims that began to accrue before October 5, 2022. The court will, however, allow JCI to argue at trial that it can still seek the lost productivity damages that it says accrued between October 5, 2022, and August 23, 2023. If JCI shows that these damages are for different events then the alleged lost productivity damages that predate October 5, 2022, the court may find that the subcontract's notice provision doesn't bar JCI from seeking these damages.

## CONCLUSION

For these reasons, the court **GRANTS** Starbelt and Meta's motion for summary judgment (doc. 131) and will **DISMISS** JCI's claims against them **WITH PREJUDICE**. The court **DENIES** Holder's motion for partial summary judgment (doc. 133). The court **GRANTS IN PART** and **DENIES IN PART** Schuff's motion for partial summary judgment (doc. 123). The court **DENIES AS MOOT** JCI's motion for a hearing (doc. 151).

The parties will try these claims during the **February 2, 2026**, bench trial:

- **JCI Counts 1-2:** Breach of Contract against Schuff and Holder;
- **JCI Counts 3-4:** Violation of the Alabama Prompt Pay Act against Schuff and Holder;
- **JCI Count 6:** Quantum Meruit against Holder;
- **JCI Count 8:** Lien Perfection against Euler Hermes, Everest Reinsurance, and Markel;
- **JCI Count 9:** Fraud against Holder;
- **Schuff Counterclaim 1:** Breach of Contract; and
- **Schuff Counterclaim 2:** Indemnity.

**Done** and **Ordered** on December 9, 2025.

_Corey L. Maze_

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE